**Electronically Filed
Intermediate Court of Appeals
CAAP-17-0000714
27-JAN-2023
08:03 AM
Dkt. 306 MO**

NO. CAAP-17-0000714

IN THE INTERMEDIATE COURT OF APPEALS

OF THE STATE OF HAWAI'I

DAVID COWAN and NATHALIE COWAN; UMANG P. GUPTA and
RUTH M. GUPTA, as Trustees of the Umang and Ruth Gupta
Trust under Trust Agreement dated January 18, 2000; and
PAUOA BEACH 8 LLC, a Hawaii Limited Liability Company,
Plaintiffs-Appellants,

and

ROARING LION, LLC, a Montana Limited Liability Company;
ROGER A. GREENWALD and JENNIFER A. HURWITZ,
Plaintiffs-Appellees,

vs.

PAUOA BAY PROPERTIES LLC, a Delaware Limited Liability
Company; WHITE SAND BEACH LIMITED PARTNERSHIP, a Delaware
Limited Partnership; EXCLUSIVE RESORTS PBL1, LLC, a
Delaware Limited Liability Company; PAUOA BEACH REALTY LLC,
a Hawaii Limited Liability Company; EXCLUSIVE RESORTS PBL3,
LLC, a Delaware Limited Liability Company; JOHN DOES 1-50,
Defendants-Appellees

APPEAL FROM THE CIRCUIT COURT OF THE THIRD CIRCUIT
(CIVIL NO. 04-1-0332)

MEMORANDUM OPINION
(By: Leonard, Presiding Judge, Wadsworth and McCullen, JJ.)

Plaintiffs/Counterclaim-Defendants/Appellants/Cross-

Appellees David Cowan and Nathalie Cowan, Umang P. Gupta and Ruth

M. Gupta, as Trustees of the Umang and Ruth Gupta Trust Under

Trust Agreement dated January 18, 2000, and Pauoa Beach 8 LLC (**Plaintiffs**) appeal from the June 9, 2017 Final Judgment on Remand (**Remand Judgment**) entered by the Circuit Court of the Third Circuit (**Circuit Court**).[1]  Defendant/Counterclaimant /Crossclaimant/Crossclaim-Defendant/Appellee/Cross-Appellant Exclusive Resorts PBL1, LLC (**PBL1**) cross-appeals from the Remand Judgment.  Both sides challenge the Circuit Court's Findings of Fact and Conclusions of Law (**FOFs & COLs**) entered on March 28, 2017.  Plaintiffs also challenge the Circuit Court's Order Denying Plaintiffs' [Motion for Attorneys' Fees] (**Order Denying Attorneys' Fees**) entered on September 15, 2017.

The Circuit Court previously entered judgment after granting summary judgment in favor of PBL1, finding that PBL1's development and use of certain property for a "luxury destination club" did not violate applicable restrictive covenants.  On appeal from the earlier judgment, the Intermediate Court of Appeals (**ICA**) remanded the case to the Circuit Court having concluded that summary judgment should not have been entered because there was a genuine issue of material fact as to whether PBL1's rental activities rise to the level of a commercial use.[2]  No party sought *certiorari* review of this court's decision in PBL1 I.  After remand and a seven day bench-trial, the Circuit Court entered the Remand Judgment.  This second appeal followed.

---

[1]     The Honorable Greg K. Nakamura presided.

[2]     See Roaring Lion, LLC v. Exclusive Resorts PBL1, LLC, No. CAAP-11-0001072, 2013 WL 1759002, *1 (Haw. App. Apr. 24, 2013) (mem. op.) (**PBL1 I**). After PBL1, Plaintiff Roaring Lion, LLC was dismissed from the case by stipulation.

I.  BACKGROUND FACTS

The dispute concerns the Pauoa Beach subdivision within the Mauna Lani Resort (**Resort**) master development[3] in the County of Hawaiʻi.  The Resort includes hotels, residences, retail operations, recreational areas, golf courses, and other uses and services.  All lots in the Pauoa Beach subdivision are subject to both the Mauna Lani Resort Association Declaration of Covenants and Restrictions (**Resort Declaration**) and the Pauoa Beach Declaration of Covenants, Conditions, Restrictions, and Easements (**Pauoa Beach Declaration**) (collectively, **Project Documents**).

Pauoa Beach consists of two subdivisions with residential lots:  a subdivision of oceanfront lots (**Makai Subdivision**) and a subdivision of non-oceanfront lots (**Mauka Subdivision**).  Plaintiffs own lots in the Makai Subdivision of Pauoa Beach.  In December 2003, non-party Exclusive Resorts, LLC (**ER**) — PBL1 and Exclusive Resorts PBL3's (**PBL3**)[4] parent company — purchased lots in the Mauka Subdivision.  The lots were consolidated and renamed Lot B, and ER received approval from the Mauna Lani Resort Design Committee to build eight condominium units in the form of four duplexes on Lot B.  ER assigned its purchase agreement for Lot B to a non-party subsidiary.  Upon completion of construction of the residences at the Pauoa Beach lots, PBL1 and PBL3 (collectively, **Defendants**) intended to make

---

[3]  A "master development" means "a real estate development that consists of more than one project, including but not limited to a planned community association subject to [Hawaii Revised Statutes (**HRS**)] chapter 421J [(2004 Repl.)] with one or more sub-associations."  HRS § 514E-1 (2018).

[4]  Although PBL3 was a defendant, PBL3 sold its lot, and the Circuit Court granted PBL3's motion for summary judgment.  This ruling was not challenged and PBL3 is no longer a party.

the residences available to members of a luxury destination club, the details of which are discussed further below.  During the litigation of the summary judgment proceedings subject to the previous appeal, construction of the four duplexes on Lot B was underway, and there was no evidence regarding actual use of Lot B.  However, the record indicated that destination club members who stayed elsewhere in the Resort received some access to Pauoa Beach facilities.

The Resort Declaration governs the permitted uses in all subdivisions within the Resort, including Pauoa Beach, and states that all properties within the Resort are subject to certain restrictive covenants running with the land.  Article V lists the restrictive covenants and contains a section providing general restrictions on land use.  Section 1(a)(14) states:

> (14) Except in the case of Commercial Lots, <u>no gainful occupation, profession or trade shall be maintained</u> on any Lot or in any structure on any Lot without the prior approval of the [Resort] Board, <u>except that this provision shall in no way</u> limit or restrict Declarant or Declarant's Nominees in their activities prior to the sale, leasing or other development of Lots within the Mauna Lani Resort nor <u>prevent Owners from renting their houses, apartment units or Condominium Units</u>.

(Emphasis added).

The Pauoa Beach Declaration states:  "Developers intend to develop the Property for residential use comprised of Lots and the Association Property and, at the election of Developers, one or more Condominium Projects, and to sell or otherwise convey the Lots, Units and Association Property."  The Pauoa Beach Declaration provides that if it contains a provision more restrictive than that in the Resort Declaration, the more

4

restrictive provision controls.  The Pauoa Beach Declaration

contains the following use restrictions:

> § 15.4.1  *Residential Use*.  All Lots and Units shall
> be <u>used only for residential use (whether transient or
> permanent) and incidental activities</u> and in compliance with
> the Resort Declaration and applicable law (including zoning
> ordinances and building codes).  As provided in the Resort
> Declaration, <u>no gainful occupation, profession or trade
> shall be maintained </u>on any Lot or Condominium Common
> Elements or within any Unit without the prior approval of
> the Board of Directors of the Resort Association[.]
>
> § 15.4.13  *Timeshare Prohibited*.  No timeshare use or
> ownership plan to which Chapter 514-E, [HRS] would be
> applicable shall be permitted with respect to all or any
> portion of the Property.

(Emphasis added).

Litigation ensued regarding, *inter alia*, whether

Defendants' development and the operation of a luxury destination

club violated the Project Documents' restrictive covenants, which

allow only residential use.  In the earlier phase of the

litigation, the Circuit Court granted partial summary judgment

and concluded that Defendants' project did not violate the

Project Documents' restrictive covenants in that (1) the use did

not violate the covenants regarding residential use in Pauoa

Beach, and (2) the project did not constitute a "time share

plan."  That judgment was appealed to this court in <u>PBL1 I</u>.

In <u>PBL1 I</u>, the ICA affirmed the Circuit Court's

decision that the project did not constitute a time share plan.

<u>PBL1 I</u>, 2013 WL 1759002 at *6-*11.  Regarding the residential use

covenants, this court reviewed the Project Documents' restrictive

covenants and held that

> because the Project Documents contemplate only two types of
> lot use, and because the prohibition of "gainful occupation,
> profession or trade" is the only use restriction unique to
> residential lots, any use rising to the level of maintaining

> a "gainful occupation, profession or trade" constitutes a commercial use and cannot be deemed "residential" within the meaning of the Project Documents.

Id. at *5.

We explained that to determine whether a use violates the restrictive covenants, the nature and character of the owner's use must be considered. Id. at *6. We noted that to determine whether rental activities exceed the scope of "residential use," other jurisdictions have found relevant "whether the owner provided services or conducted transactions on-site." Id. We further explained that

> [t]he nature and extent of such services (such as any increase in noise, traffic, or pollution; the hours of operation; and whether outside employees would be working on-site) are also relevant to whether Defendants' use constitute "incidental activities," which are permitted under the "residential use" provisions.

Id.

We concluded that the Circuit Court erred in granting summary judgment and we stated:

> [I]t is undisputed in this case that Defendants intended to provide a number of services and amenities to its renters. Because construction of Defendants' Pauoa Beach units was ongoing during the summary judgment proceedings, however, <u>there is little in the record before us that we can use to accurately determine the impact of Defendants' intended use of its Lot B units</u>. At oral argument, Defendants' counsel did not know whether Defendants' services and amenities would be provided at the units or off-site, and <u>it is unclear from the record the extent to which such activities would result in increased noise, traffic, or usage of the subdivision's common facilities</u>.
>
> Based on the foregoing, we conclude that although the Project Documents expressly allow "transient" rentals, the Project Documents on the whole establish the parties' intent to limit the scale and scope of the unit owners' rental activity. <u>We further conclude that whether Defendants' intended use rises to the level of maintaining a "gainful occupation, profession or trade" remains a genuine issue of material fact</u>. The circuit court erred in granting partial summary judgment on the issue of whether Defendants' use

> violated any of the Project Documents' restrictions related to residential use.

Id.[5] (emphasis added).

After remand, the Circuit Court conducted a bench trial at which evidence regarding PBL1's actual use of the Lot B units was presented.  On September 20, 2016, the Circuit Court entered a Decision and Order (**Order**).  The Circuit Court determined, *inter alia*, that the Lot B units were "commercial apartments" and PBL1 was a "commercial owner."  The court then made findings with respect to PBL1's actual use of the property, but did not separately state whether the actual use rose to the level of a "commercial use."  The court stated, "[t]herefore, the ultimate conclusion is that the [PBL1's] use of the Lot B units is 'commercial' under the terms of the Resort Declaration and, therefore, violates the use restrictions under the Project Documents."

On November 15, 2016, the Order was amended upon the motion of PBL1 with respect to the significance placed upon the revenue generated by Lot B in determining whether the use of Lot B was commercial.  The Circuit Court determined that "revenue generated is evidence that the use of the Lot B units is a 'commercial use', but is not sufficient in and of itself to conclude that the use of the Lot B units is a 'commercial use'".

On March 28, 2017, the Circuit Court entered the FOFs & COLs wherein the Circuit Court again found that PBL1 was a

---

[5]     A separate appeal regarding the existence and enforcement of a settlement agreement was considered by this court in Roaring Lion, LLC v. Exclusive Resorts PBL1, LLC, CAAP-12-0000003, 2013 WL 1759005 (Haw. App. Apr. 24, 2013) (mem. op.).

"commercial owner" of "commercial apartments" and therefore, the use of the Lot B units was commercial and violated the Project Documents. The Circuit Court also set forth findings as to the "other factors" to determine whether PBL1's actual use of the property rose to the level of a "commercial use."

On June 9, 2017, the Circuit Court entered the Remand Judgment, stating:

> 1. Final Judgment is hereby entered in favor of [Plaintiffs] and against PBL1 as follows: PBL1's use of the Lot B units at Pauoa Beach Subdivision is a "commercial use" pursuant to Article I, Sections 1(h), 1(i) and 1(l) of the Mauna Lani Resort Association Declaration of Covenants and Restrictions, as amended, and therefore, violates the use restrictions under Article B, Section 1(a)(14) of the Mauna Lani Resort Association Declaration of Covenants and Restrictions, as amended, and Article 15, Section 15.4.1 of the Pauoa Beach Declaration of Covenants, Conditions, Restrictions & Easements, as amended.
>
> 2. However, final judgment is entered in favor of PBL1 and against Plaintiffs as follows: PBL 1's actual use of the Lot B units at the Pauoa Beach Subdivision for destination club purposes as described in the [FOFs & COLs] does not rise to the level of "commercial use" and, therefore, Plaintiffs are not entitled to injunctive relief against PBL1.

On June 23, 2017, Plaintiffs filed a Motion for Award of Attorneys' Fees (**Motion for Attorneys' Fees**) seeking fees pursuant to HRS § 607-14 (2016) as the prevailing party under a contract that provides for an award of attorneys' fees. On September 15, 2017, the Circuit Court entered the Order Denying Attorneys' Fees on the ground that Plaintiffs were not the prevailing party. On November 21, 2017, the Circuit Court entered separate FOFs and COLs on the Attorneys' Fees Order.

Both parties now appeal.

II. POINTS OF ERROR

PBL1 raises two points of error, contending that the Circuit Court erred: (1) when it determined commercial use based

8

solely on definitions in the Project Documents, thereby exceeding this Court's mandate on remand, and ignoring the law of the case; and (2) when it applied the definitions in the Project Documents to find that Lot B was a Commercial Apartment and PBL1's use of Lot B was a commercial use.

Plaintiffs raise three points of error, contending that the Circuit Court erred:  (1) when it denied them injunctive relief; (2) when it held that PBL1's actual use of the Lot B units did not rise to the level of commercial use; and (3) when it denied their request for attorneys' fees and costs.

III. <u>APPLICABLE STANDARDS OF REVIEW</u>

> A trial court's findings of fact are reviewed under the clearly erroneous standard and conclusions of law are reviewed *de novo* under the right/wrong standard. [<u>Nordic PCL Const., Inc. v. LPIHGC</u>, 136 Hawaiʻi 29, 41, 358 P.3d 1, 13 (2015)]. "A finding of fact is clearly erroneous when, despite evidence to support the finding, the appellate court is left with the definite and firm conviction in reviewing the entire evidence that a mistake has been committed" or "when the record lacks substantial evidence to support the finding."  <u>Id.</u> (quoting <u>Daiichi Hawaii Real Estate Corp. v. Lichter</u>, 103 Hawaiʻi 325, 337, 82 P.3d 411, 423 (2003)). Substantial evidence is defined as "credible evidence which is of sufficient quality and probative value to enable a person of reasonable caution to support a conclusion." <u>Id.</u> (quoting <u>Daiichi</u>, 103 Hawaiʻi at 337, 82 P.3d at 423).  A conclusion of law that presents a mixed question of law and fact is reviewed under the clearly erroneous standard. <u>Estate of Klink ex rel. Klink v. State</u>, 113 Hawaiʻi 332, 351, 152 P.3d 504, 523 (2007).

<u>Noel Madamba Contracting LLC v. Romero</u>, 137 Hawaiʻi 1, 8, 364 P.3d 518, 525 (2015).

"Generally, the granting or denying of injunctive relief rests with the sound discretion of the trial court and the trial court's decision will be sustained absent a showing of a manifest abuse of discretion."  <u>In re FG</u>, 142 Hawaiʻi 497, 503, 421 P.3d 1267, 1273 (2018) (quoting <u>Sierra Club v. Dep't of</u>

Transp. of State of Haw., 120 Hawaiʻi 181, 197, 202 P.3d 1226, 1242 (2009)).

> The relief granted by a court [in] equity is discretionary and will not be overturned on review unless the [circuit] court abused its discretion by issuing a decision that clearly exceeds the bounds of reason or disregarded rules or principles of law or practice to the substantial detriment of the appellant.

Id. (citations omitted).

"The trial court's grant or denial of [attorney's] fees and costs is reviewed under the abuse of discretion standard." Kamaka v. Goodsill Anderson Quinn & Stifel, 117 Hawaiʻi 92, 105, 176 P.3d 91, 104 (2008) (citation and original brackets omitted).

IV.   DISCUSSION

   A.   PBL1's Arguments

   PBL1 first argues that the Circuit Court erred when it determined commercial use based solely on the definitions in the Project Documents.  PBL1 submits that the Circuit Court should have (i) followed this Court's mandate to resolve the issue of fact as to the impacts of the intended use of the Lot B units; and (ii) adhered to this Court's holding that "the prohibition of 'gainful occupation, profession or trade' is the only use restriction unique to residential lots."

   In PBL1 I, this court considered the Circuit Court's grant of partial summary judgment against the Plaintiffs.  As relevant here, the Circuit Court, interpreting the Project Documents, had concluded that PBL1's proposed use of Lot B would not violate the Project Documents' restrictive covenants regarding residential use, reasoning that the Project Documents allow owners to rent their homes or units and the Project

Documents still consider such a use to be a residential use. PBL1 I, 2013 WL 1759002 at *4.

We agreed that the Project Documents and surrounding circumstances supported the Circuit Court's conclusion that short-term rentals for a profit may be considered a "residential use."  Id.  We stated that "the mere fact an owner rents a unit, even on a short-term basis and for a profit, does not turn the unit's use from residential to commercial."  Id.  In a footnote, we explained that a majority of jurisdictions agree that short-term rental of property may be considered a residential use when the occupants use the property only for residential purposes. Id. at *4 n.4 (citing Slaby v. Mountain River Estates Residential Ass'n, Inc., 100 So.3d 569, 578–79, 582 (Ala. Civ. App. 2012), cert. denied, No. 1110881 (Ala. 2012)); Pinehaven Planning Bd. v. Brooks, 138 Idaho 826, 830, 70 P.3d 664, 668 (Idaho 2003) (holding that restrictive covenants disallowing "commercial or industrial ventures or business of any type" from being maintained on any lot in the subdivision were not ambiguous and, "according to their plain meaning, clearly allow the rental of residential property[,]" whether short-term or long-term, because the use "does not violate the prohibition on commercial and business activity as such terms are commonly understood").

However, we recognized that although the Project Documents "generally permit rentals," they also clearly evince an intent to prohibit "commercial activity" on the Pauoa Beach lots. PBL1 I, 2013 WL 1759002 at *5.  We explained that

> [t]he Resort Declaration contemplates only two types of
> lots:  residential and commercial.  The Resort Declaration

> defines a "Residential Lot" as a lot used for "residential purposes" by a single family or by more than one family.  A "Commercial Lot" is defined as a lot "designated for commercial purposes."  The Project Documents' two provisions prohibiting the maintenance of a "gainful occupation, profession or trade" are the only general use restrictions in the Project Documents that differentiate between "commercial" and "residential" lots.  <u>Therefore, because the Project Documents contemplate only two types of lot use, and because the prohibition of "gainful occupation, profession or trade" is the only use restriction unique to residential lots, any use rising to the level of maintaining a "gainful occupation, profession or trade" constitutes a commercial use and cannot be deemed "residential" within the meaning of the Project Documents</u>.

Id. (emphasis added).

We addressed the term "Commercial Apartment," defined in the Resort Declaration as "a building or structure containing apartment units which are owned substantially by a single common entity and rented or leased for profit."  Id.  The Circuit Court had concluded that since the term was only used in the Resort's bylaws that address voting right classifications of owners, then the term did not relate to use restrictions on those units.  Id. We agreed, but clarified that "[a]lthough the term may relate primarily to voting power, the definition is nevertheless relevant to our determination of the meaning intended by the parties because we must consider the entire context of the covenants."  Id. (citation omitted).  We reaffirmed that it is the nature and character of the owner's use rather than the unit's occupants that determines whether a use restriction has been breached.  Id. at *6.

We then recognized that although transient rentals for profit by an owner can constitute a "residential use" under the Project Documents, in certain circumstances rental activities can "exceed the scope of 'residential use'" and become a commercial

12

use, *i.e.*, the maintenance of a "gainful occupation, profession or trade." Id. We identified some potential criteria to discern whether transient rental activities exceed the scope of residential use. We explained that

> one factor other jurisdictions have found relevant is whether the owner provided services or conducted transactions on-site. The nature and extent of such services (such as any increase in noise, traffic, or pollution; the hours of operation; and whether outside employees would be working on-site) are also relevant to whether Defendants' use constitute "incidental activities," which are permitted under the "residential use" provisions. See Pauoa Beach Declaration § 15.4.1 ("All Lots and Units shall be used only for residential use (whether transient or permanent) and incidental activities[.]").

Id. (footnotes omitted).

We concluded that although the Project Documents allowed owners to conduct transient rentals for a profit as a "residential use," the actual conduct of that activity could rise to such a level as to become a commercial use. We further concluded that

> whether Defendants' intended use rises to the level of maintaining a "gainful occupation, profession or trade" remains a genuine issue of material fact. The circuit court erred in granting partial summary judgment on the issue of whether Defendants' use violated any of the Project Documents' restrictions related to residential use.

Id. We vacated the Circuit Court's partial summary judgment order and remanded the case for further proceedings. Id. at *11. On remand, the parties presented evidence regarding PBL1's actual use of Lot B, and the Circuit Court made FOFs & COLs with respect thereto, which are discussed below.

On remand, the Circuit Court impermissibly disregarded this court's conclusion that the Project Documents did not on their face render PBL1's proposed transient rentals of Lot B units for profit as a "commercial use." The Circuit Court

13

pointed to this court's statement in <u>PBL1 I</u> that our construction of the term "commercial" was informed by the Resort Declaration's definition of the term "Commercial Apartment."  The Circuit Court found of interest the definition of "Commercial Apartment" as "a building or structure containing apartment units which are owned substantially by a single common entity and rented or leased for profit" because, according to the Circuit Court, "it strongly suggests that if a building or structure is a 'commercial apartment' then its use is commercial."

The Circuit Court then looked at the definitions of "Commercial Owner" and "Commercial Apartment" in the Resort Declaration.  Under the Resort Declaration, a "Commercial Owner" is an "owner who holds . . . Commercial Apartment(s) . . . within the Mauna Lani Resort primarily for commercial purposes."  A "Commercial Apartment" is any unit in the resort "designated for commercial purposes," "provided that the term Commercial Abatements shall mean a building or structure containing apartment units which are owned substantially by a single common entity and rented or leased for profit."  The Circuit Court concluded that pursuant to those definitions PBL1 was a "Commercial Owner" and the Lot B units were "Commercial Apartments" and therefore, "PBL1's use of the Lot B units is 'commercial' under the terms of the Resort Declaration, and therefore, violates the use restrictions under the Project Documents."

PBL1 argues, *inter alia*, that the Circuit Court's reevaluation of the language of the Project Documents violates

the principle of "law of the case."  This argument has merit.

The Hawaiʻi Supreme Court has explained:

> The law of the case doctrine holds that "a
> determination of a question of law made by an appellate
> court in the course of an action becomes the law of the case
> and may not be disputed by a reopening of the question at a
> later stage of the litigation." Fought & Co. v. Steel Eng'g
> & Erection, Inc., 87 Hawaiʻi 37, 48–49, 951 P.2d 487, 498–99
> (1998) (citation omitted).  "This doctrine applies to issues
> that have been decided either expressly or by necessary
> implication." Id.  In other words, "the usual practice of
> courts to refuse to disturb all prior rulings in a
> particular case" is referred to as the "law of the case"
> doctrine. Chun v. Bd. of Trs. of the Emps.' Ret. Sys. of
> State of Hawaii, 92 Hawaiʻi 432, 441, 992 P.2d 127, 136
> (2000) (citations omitted).  "Unless cogent reasons support
> the second court's action, any modification of a prior
> ruling of another court of equal and concurrent jurisdiction
> will be deemed an abuse of discretion." Wong v. City &
> Cnty. of Honolulu, 66 Haw. 389, 396, 665 P.2d 157, 162
> (1983) (emphasis omitted).  Consequently, the "law of the
> case" doctrine "does not preclude modification of a prior
> ruling in all instances." Stender v. Vincent, 92 Hawaiʻi
> 355, 361, 992 P.2d 50, 56 (2000).

Hussey v. Say, 139 Hawaiʻi 181, 185, 384 P.3d 1282, 1286 (2016).

The construction of the terms of restrictive covenants,

like the terms of a contract, are questions of law.  See

Sandomire v. Brown, 144 Hawaiʻi 314, 324, 439 P.3d 266, 276 (App.

2019).  In PBL1 I, Plaintiffs made the argument to the ICA that

the Circuit Court adopted on remand.  In PBL1 I, we considered

the Circuit Court's rejection of the Plaintiffs' claim that the

Project Documents classified PBL1's proposed use of Lot B as an

impermissible "commercial use."  2013 WL 1759002 at *1–*6.  In

PBL1 I, the Plaintiffs argued:

> The error committed by the circuit court is even more
> egregious given that the Resort Declaration clearly defines
> one type of use or activity which would be considered
> "commercial": a "Commercial Apartment."  The Resort
> Declaration defines a "Commercial Apartment" as "a building
> or structure containing apartment units which are owned
> substantially by a single common entity and rented or leased
> for profit."  The structure containing the Na Hale
> condominium units owned by ER3 is "a building or structure
> containing apartment units which are owned substantially by
> a single common entity," ER3, and whose units are "rented or
> leased for profit."  If ER3 owns a "Commercial Apartment,"
> it is a "Commercial Owner," which is defined by the Resort

15

> Declaration as "an owner who holds, owns or occupies a Commercial Lot(s) or Commercial Apartment(s) or other property within the Mauna Lani Resort primarily for commercial purposes."  Thus ER3 is engaged in commercial activity in violation of the residential use provisions of the Resort Declaration and the Pauoa Beach Declaration.  At the very least, the factual issue of whether ER3 is running a Commercial Apartment in "gainful occupation, profession or trade" is a genuine issue of material fact that precludes summary judgment.

(Record citations omitted).

Plaintiffs further argued that the Circuit Court's (earlier) conclusion that the definition of "Commercial Apartments" did not relate to use restrictions but rather categorized ownership interests to determine voting power and assessments was strained and ignored the plain meaning of the terms.

This court did not adopt Plaintiffs' proposed reading of the terms "Commercial Owner" or "Commercial Apartment" to deem the use of the subject property to be a commercial use, regardless of the actual use of the subject property.  See PBL1 I, 2013 WL 1759002 at *1-*6.  We agreed with the Circuit Court that the term "Commercial Apartment" related primarily to voting power, but also considered the term insofar as it was relevant to determine the meaning of the covenants in their entire context. See id. at *5.  However, we concluded that based on the construction of the Project Documents with respect to residential versus commercial use restrictions, "the prohibition of 'gainful occupation, profession or trade' is the only use restriction unique to residential lots."  Id.  We did not conclude that the status of an owner as a commercial owner of a commercial apartment was determinative as to whether the use of the property

is a commercial use or residential use.[6]  Id.  On the contrary, we concluded that the actual use of the property was determinative of whether the residential-use-only restriction was violated.

The Circuit Court's reasoning that PBL1 was a commercial owner of commercial apartments and therefore, the transient rental of the Lot B units is a "commercial use" under the Project Documents was already rejected by this Court in PBL1 I.  We remanded the case for development of an evidentiary record as to the actual use of the Lot B units, not for reargument on the meaning of the Project Documents.  Pursuant to the doctrine of law of the case, this court's earlier ruling should not have been disturbed.  Hussey, 139 Hawaiʻi at 185, 384 P.3d at 1286.  Even considering the entirety of the record of proceeding which followed remand, we see no cogent reason to reconsider this Court's construction of the restrictive convenants in PBL1 I, which concluded that the status of an owner as a "commercial owner" of "commercial apartments" pertained primarily to voting power and, while a relevant consideration, that status was not determinative of the "use" of the property.  PBL1 I, 2013 WL 1759002 at *5.  Again,

> [t]he Project Documents' two provisions prohibiting the maintenance of a "gainful occupation, profession or trade" are the only general use restrictions in the Project Documents that differentiate between "commercial" and "residential" lots.  Therefore, because the Project Documents contemplate only two types of lot use, and because the prohibition of "gainful occupation, profession or trade" is the only use restriction unique to residential lots, any use rising to the level of maintaining a "gainful occupation, profession or trade" constitutes a commercial

---

[6]     On appeal, PBL1 also contests that it is a commercial owner of commercial apartments.

> use and cannot be deemed "residential" within the meaning of
> the Project Documents.

Id.

Thus, the Circuit Court erred when it failed to apply the law-of-the-case set forth in PBL1 I, and concluded that PBL1's use of Lot B was a "commercial use" based on the definitions stated in the Project Documents, without regard to the actual use of the Lot B units.

As further discussed below in the context of Plaintiffs' arguments on appeal, on remand, based on the evidence presented at trial, the Circuit Court determined that PBL1's actual use of the Lot B units did not rise to the level of commercial use.  However, the Circuit Court nevertheless determined that PBL1's use of the Lot B units was a commercial use based on the its application of the definitions in the Project Documents.

In its second point of error, PBL1 argues, *inter alia*, that the Circuit Court erred when it applied the definitions in the Project Documents to PBL1 and the Lot B units to find that (1) Lot B was a "Commercial Apartment;" and therefore, (2) PBL1's use of Lot B was a "commercial use."  PBL1 argues that the Circuit Court should have found that (i) the definition of "commercial apartments" is not dispositive of whether the use of Lot B units rises to the level of maintaining a "gainful occupation, profession or trade;" (ii) the Lot B units are not "apartment units" and therefore cannot fall within the definition of "commercial apartments;" and (iii) the Lot B units do not otherwise fall within the definition of "Commercial Apartment."

18

Even assuming *arguendo* that PBL1 was a "commercial owner" of "commercial apartments", as explained above, this court in PBL1 I determined that the status of an owner under the Project Documents as a "commercial owner" of "commercial apartments" does not make the use a "commercial use." This court previously held that "[t]he Project Documents, two provisions prohibiting the maintenance of a 'gainful occupation, profession or trade' are the only general use restrictions in the Project Documents that differentiate between 'commercial' and 'residential' lots." Id. at *5. On that basis, this court ruled that "the prohibition of 'gainful occupation, profession or trade' is the only use restriction unique to residential lots[.]" Id. This court likewise determined that "any use rising to the level of maintaining a 'gainful occupation, profession or trade' constitutes a commercial use and cannot be deemed 'residential' within the meaning of the Project Documents." Id. Whether the Defendants' use rises to that level and thus constitutes a commercial use was the genuine issue of material fact to be determined on remand. Thus, the Circuit Court erred in concluding that PBL1's use of the Lot B units was a commercial use in violation of the restrictive covenants contained in the Project Documents even though the Circuit Court concluded that the actual use did not rise to the level of commercial use. We decline to revisit this court's interpretation of the Project Documents to conclude otherwise.

B.    Plaintiffs' Arguments

We address Plaintiffs' second argument first, as it informs our decision with respect to Plaintiffs' other contentions.

Plaintiffs argue that the Circuit Court erred when it held that PBL1's actual use of the Lot B units at the Pauoa Beach subdivision for destination club purposes does not rise to the level of a commercial use because the court failed to examine the overall "scale and scope" of PBL1's rental activity of the Lot B units.  Plaintiffs argue the court improperly compared PBL1's actual use of its Lot B units, which was fully supported by the evidence, to the hypothetical use by an individual resident homeowner, which Plaintiffs submit was unsupported by any evidence.

In PBL1 I, the ICA held that "although the Project Documents expressly allow 'transient' rentals, the Project Documents on the whole establish the parties' intent to limit the scale and scope of the unit owners' rental activity."  2013 WL 1759002 at *6 (emphasis added).  We further held that there was a genuine issue of material fact whether PBL1's "intended use rises to the level of maintaining a 'gainful occupation, profession or trade.'"  Id.  Thus, on remand, the Circuit Court was charged with evaluating the scale and scope of the PBL1's rental activity to determine whether it rose to the level of maintaining a gainful occupation, profession, or trade, as opposed to "incidental activities" appurtenant to residential use and, to

20

determine whether PBL1's use of the Lot B units is an impermissible commercial use under the Project Documents.  Id.

In PBL1 I, this court did not set out an exhaustive list of factors to be considered by the Circuit Court, but we noted that other jurisdictions found relevant "whether the owner provided services or conducted transactions on-site."  Id.[7]  In addition, we also stated that "[t]he nature and extent of such services (such as any increase in noise, traffic, or pollution; the hours of operation; and whether outside employees would be working on-site) are also relevant to whether [PBL 1's] use constitute[s] 'incidental activities,' which are permitted under the 'residential use' provisions."  Id.

On remand, the Circuit Court weighed the evidence presented by the parties and evaluated the following factors to determine whether the scale and scope of PBL1's rental activities rose to the level of a commercial use:  (1) access to the Lot B units; (2) revenues from the Lot B units; (3) occupancy of the Lot B units; (4) activities of the resident manager and concierges; (5) services provided to Lot B units; (6) use of the

---

[7]     In PBL1 I, we cited, *inter alia*, Applegate v. Colucci, 908 N.E.2d 1214 (Ind. Ct. App. 2009), in which the court analyzed restrictive covenants requiring that subdivision parcels be "used only for residential purposes" and stating:  "No commercial business shall be carried on upon any parcel[.] Nothing herein contained shall prevent the leasing or renting of property or structures for residential use[.]"  Id. at 1217.  The court concluded the owners' short-term rental of their cabins was allowed, but the maintenance of a rental office on the property created a question of fact as to whether covenants were violated.  Id. at 1219–21.  We also cited Slaby v. Mountain River Estates Residential Ass'n, Inc., 100 So.3d 569, 580, 582 (Ala. Civ. App. 2012), which noted that owners rented their cabin as a residence but did not provide any services to their tenants and did not conduct any mercantile or financial transactions on-site.  Finally, we cited Yogman v. Parrott, 325 Or. 358, 361, 937 P.2d 1019, 1021 (Or. 1997), which noted the owners "provide no goods, staff, or services at the house" and "renters use their own linens, do their own cleaning, buy and prepare their own food, and take out their own garbage."  See PBL1 I, 2013 WL 1759002 at *6 n.5.

Pauoa Beach Club; and (7) incidents involving misconduct by ER Members visiting the Lot B units.

Plaintiffs do not challenge the Circuit Court's findings as to factors (1), (4), (6), and (7), which are the following:  (1) access to the Lot B units - the Circuit Court found that use by ER members of the Lot B units and access used by service providers had a minimal impact upon the use of property by other owners and does not support a conclusion that PBL1's use of the Lot B units is commercial in nature; (4) activities of the resident manager and concierges - the Circuit Court found that the activities of the resident manager and concierges were not significant enough to support a conclusion that PBL1's use was commercial; (6) use of the Pauoa Beach Club - the Circuit Court found that the use of the beach club by ER members was not shown to be significant enough to support a conclusion of commercial use; and (7) incidents involving misconduct by ER members visiting the Lot B units - the Circuit Court concluded that the number of incidents of misconduct by ER members did not support a conclusion that PBL1's use of Lot B was commercial.

Plaintiffs argue that the Circuit Court's analysis of factors (2), (3), and (5) above, regarding revenue, occupancy, and on-site maintenance and housekeeping services, demonstrate that the court clearly erred in evaluating the nature and scope of PBL1's actual use of the Lot B units given the evidence at trial.

Factor 2.  The Circuit Court considered the revenues generated by PBL1 from its rental of the Lot B units.  The court compared the revenues from the Lot B units to the revenue generated by David and Nathalie Cowan (the **Cowan Plaintiffs**) from the rental of their property in the Pauoa Beach subdivision. Plaintiffs do not dispute the figures found by the Circuit Court with respect to PBL1's revenues.  Income statements showed that from 2009 through 2014, PBL1 listed revenues from service income of at least $8,418,353.93.  ER's general excise/use tax forms for Hawaiʻi County from 2009 through July 2015 showed state taxable income in Hawaiʻi County of at least $8,724,371, although it was not known how much was attributable to the Lot B units as compared to other ER-related properties located at Pauoa Beach.

Regarding the Cowan Plaintiffs' rental of their property at the Pauoa Beach subdivision, the court found:

> From January through March 2014, the Cowan Plaintiffs rented their home for $180,000.  Between January and August 2015, they entered into three additional short-term rental agreements charging a total of $270,778.61 plus tax and utilities (in the case of one three-month rental), or $33,847.32 per month.  If the Cowan Plaintiffs maintained that same rate of revenue from 2009 through July 2015, they would have earned $2,673,938.28 from their one home.

The Circuit Court found that "the level of revenues generated by the Lot B units is indicative of commercial use of the Lot B units by PBL1, but is not dispositive of the issue."

Plaintiffs argue that there was no evidence to support the Circuit Court's use of the Cowan Plaintiffs' rental activity as representative of the typical resident at Pauoa Beach, and thus the Circuit Court's extrapolation of the hypothetical resident owner's rental income was unsupported and clearly

erroneous.  Plaintiffs identify other evidence at trial, a list showing the rental activity of three residences at Pauoa Beach, that is significantly less than the Cowan Plaintiffs' rental of their property.  PBL1 counters that (1) revenues are not a factor identified by this court in PBL1 I as a relevant consideration and (2) the comparison was useful to show that the revenue generated by PBL1 was on par with the Cowan Plaintiffs' own rental activities.

As the Circuit Court found, the dollar amount of revenue generated, in and of itself, is relevant but not determinative as to whether the scale and scope of the rental activities amount to a commercial use.  This Court stated in PBL1 I that the Project Documents provide that "the mere fact an owner rents a unit, even on a short-term basis and for a profit, does not turn the unit's use from residential to commercial."  PBL1 I, 2013 WL 1759002 at *4 (footnote omitted).  Rather than the isolated fact of rental, we explained that it is the impact of the use of the Lot B units that would determine whether the rental activities exceed the scope of "residential use," which was to be determined by an analysis of all of the evidence concerning the property's use, particularly the nature and extent of services provided with respect to the properties.

There is no restriction in the Project Documents on an owner's rental of their property, long-term or transient, so long as, looking at all of the evidence related to that activity, the use does not rise to the level of commercial use.  See Resort Declaration § 1(a)(14); Pauoa Beach Declaration § 15.4.1.  The

Circuit Court heard evidence of both the Cowan and Gupta Plaintiffs' own rental activity of their respective properties, as well as the Defendants' activities.  The Circuit Court made no judgment about the Plaintiffs' use of their properties, except as part of a fact-weighing process to determine the nature of the Defendants' use of their property, all of which were located in the same subdivision of this high-end oceanfront resort.  The Circuit Court's consideration of the evidence concerning the Cowan Plaintiffs' rental activity to assess the weight to be given to revenue generated from the Defendants' use of the Lot B units was squarely and reasonably within the court's province as the fact-finder and will not be disturbed on appeal.  See, e.g., Porter v. Hu, 116 Hawaiʻi 42, 59-60, 169 P.3d 994, 1011-12 (App. 2007) ("An appellate court will not pass upon the trial judge's decisions with respect to the credibility of witnesses and the weight of the evidence, because this is the province of the trial judge.") (citing State v. Eastman, 81 Hawaiʻi 131, 139, 913 P.2d 57, 65 (1996)).

Factor 3.  The Circuit Court considered the occupancy numbers for the Lot B units and compared that occupancy to what it might be if inhabited by full-time resident owners, in order to help the court discern whether the use rose to the level of commercial use, as opposed to residential use.  The court made the following findings:

> 36.  Plaintiffs contend that the degree of occupancy of ER members supports the conclusion that the use of Lot B units is commercial.  For this purpose, Ex. P-237A shows that for the period of 2013 and 2014, the number of ER members at Pauoa Beach totaled 3,580 or 1,790 on average per year.

37.  First, it is not clear that all of these ER members stayed at the Lot B units rather than at ER's other Pauoa Beach units.  If this number reflects only ER members who stayed at the Lot B units and assuming each guest stayed seven days (even if the average is actually less), then the number of, let us say "occupancy days," averaged 12,530 (1,790 occupants x 7 days - 12,530 occupancy days) per year.

38.  In contrast, if the Lot B units were occupied by resident owners, and that each unit had four occupants, then the annual number of occupancy days would average 11,680 (8 units x 4 occupants x 365 days = 11,680 occupancy days) per year. Alternatively, since the Lot B units are four-bedroom units, it may be fairer to assume that if the Lot B units were occupied by resident owners, then each unit would have five occupants, two occupants in the master bedroom and one each in the other bedrooms.  Under this scenario, the annual number of occupancy days would be 14,600 (8 units x 5 occupants x 365 days = 14,600 occupancy days) per year.

39.  The point is that the degree of occupancy of the Lot B units by ER members is not substantially greater than the degree of occupancy of the units had they been occupied by resident owners.  It does not support the conclusion that PBL1's use of the Lot B units is commercial in nature.

First, Plaintiffs argue that the evidence at trial showed that all of the ER members reflected in Exhibit P-237A stayed at the Lot B units, and the statement in paragraph 37 that it is unclear is clearly erroneous.  The record reflects that the subject occupancy figures included only members and guests of the Lot B units, as opposed to other Pauoa Beach units.  However, the Circuit Court proceeded with its analysis assuming the figures represented only guests to the Lot B units.  Thus, although that statement was clearly erroneous, the error was harmless.  See, e.g., Dupree v. Hiraga, 121 Hawaiʻi 297, 320 n.28, 219 P.3d 1084, 1107 n.28 (2009);  Kahawaiolaa v. United Airlines, Inc., No. 30580, 2012 WL 54497, *2 (Haw. App. Jan. 9, 2012) (SDO).

Plaintiffs argue that the comparison made by the Circuit Court is otherwise erroneous because the exhibit listing the history of the number of guests at the Lot B units shows that

the actual density of guests was greater than the court's hypothetical 4- to 5-person resident owner occupancy.  They also argue that the "occupancy days" analysis lacks legal precedent and does not measure the true impact of the churn of visitors staying at the residences as compared to resident owners.  While the number of persons staying at the Lot B units fluctuated, the court simply utilized "occupancy days" as one of the ways to weigh the evidence, to reach a determination of whether the use of the property was residential or commercial.  "Occupancy days" was just one factor considered by the Circuit Court, based on the evidence presented at trial, and it was a logical and reasonable way to assess this evidence of PBL1's use.  The Circuit Court used the actual number of ER members visiting over a two-year period to come up with an average number each day to compare with a full-time permanent resident.  We decline to step into the province of the trial court as to how it evaluated and weighed this aspect of the evidence, and we conclude that the Circuit Court did not clearly err in finding that the degree of occupancy of the Lot B units does not support the conclusion that PBL1's use of the Lot B units is commercial in nature.

Finally, Plaintiffs argue there was no admissible evidence to support a presumption that other resident owners actually live at Pauoa Beach fifty-two weeks a year.  Plaintiffs' construction of the court's method of weighing the evidence is flawed.  The factual issue the court was tasked with was to determine whether, based on evidence presented by the parties at trial, PBL1's use of the Lot B units rose to the level of a

commercial use.  PBL1 I, 2013 WL 1759002 at *6.  A comparison by the court of PBL1's actual use to a hypothetical full-time residential use, as an aid in assessing PBL1's use, was permissible.

Factor 5.  The Circuit Court compared the service providers for housekeeping, landscaping, and trash pickup for the Lot B units to the services offered by the Cowan Plaintiffs.  For example, PBL1 has a maid service that changes linens twice a week and cleans kitchens and bathrooms in the Lot B units daily.  A company called Café Landscaping provides landscaping services to the Lot B units twice a week, but also provides landscaping services to the Pauoa Beach Owners Association for the subdivision's common areas.  In addition, PBL1 has two employees who provide house and pool maintenance on the units.  As a comparison, the Circuit Court found that:

> 51.  For their part, [the Cowan Plaintiffs] offer their short-term tenants (1) "[c]omplimentary maid service (except for Sundays and holidays)" with "additional maid service available"; (2) "[c]omplimentary arrival grocery shopping service"; (3) catering; (4) private chef; (5) nanny services; (6) concierge services; (7) massages; (8) car; and (9) chauffeur.  Additional services advertised by the Cowans include access to the Beach Club.

> 52.  The level of services provided by PBL1 for the maintenance and servicing of the Lot B units is consistent with maintenance and servicing ordinarily required to maintain homes and units in the Pauoa Beach Subdivision.  It does not support the conclusion that PBL1's use of the Lot B units is commercial in nature.

First, Plaintiffs argue that the "reversal" in the Circuit Court's conclusions between its Decision and Order and its FOFs is error.  In its Decision and Order, the Court stated:

> It is expected that the maintenance of the Lot B units and grounds would entail significant on-site activities.  However, considering the location, it is not clear that if the Lot B units had resident owners

> that the degree of maintenance would be significantly less than performed by PBL1.
>
> The degree of housekeeping may be more than would be expected if Lot B units had resident owners. Therefore, it is a factor which weighs toward a conclusion of commercial use, but it is not dispositive in and of itself.

Plaintiffs cite no authority for the proposition that a minor discrepancy, refinement, or even reconsideration between an initial order and subsequent FOFs is reversible error where the ultimate FOFs & COLs are supported by the evidence at trial, and we find none.

Plaintiffs again argue that the court erroneously presumed that other resident owners live at Pauoa Beach full-time throughout the year. Again, the Circuit Court's consideration of the services a full-time resident in the same high-end neighborhood might use was a logical and reasonable way to assess the evidence of PBL1's use. The question the court was asked to decide was whether its use of the Lot B units rose to the level of a commercial use. PBL1 I, 2013 WL 1759002 at *6. A comparison by the court of PBL1's actual use to full-time residential use was permissible.

Plaintiffs also argue that PBL1 offered no testimony from other homeowners at Pauoa Beach as to the services or transactions that such resident owners actually provided to their renters. However, evidence of the services advertised by the Cowan Plaintiffs, who were renting out their own property on a website VRBO.com, was admitted into evidence, and weighed by the Circuit Court. Included with the Cowan Plaintiffs' rental was a (1) complimentary maid service (except for Sundays and holidays),

29

with additional services available, (2) complimentary arrival grocery shopping services, (3) nanny services, (4) catering, (5) a private chef could be arranged, and (6) available concierge services.  David Cowan testified that at one point he rented out his property for three months and continued to use the housekeeping services, gardener, and pool steward previously employed by him when the property was occupied by a longer-term tenant.  The property management company, however, brought in another housekeeper whom it preferred to maintain the property. Cowan testified that the internet listing was created by the property management company, but neither he nor his wife requested that it be taken down.

The site manager for the Pauoa Beach Homeowners Association testified that at the time of trial in November of 2015, approximately seven Pauoa Beach properties were offered for short-term rental and one additional residence had been so offered within the previous year.  Advertisements for additional Pauoa Beach rentals in March of 2015 on VRBO.com were offered into evidence, many of which included information regarding similar provided services.  Thus, the Circuit Court's finding that the services offered by PBL1 were consistent with the maintenance and servicing ordinarily required to maintain the homes in the Pauoa Beach Subdivision was supported by the evidence before the court.

Finally, Plaintiffs argue that the Circuit Court failed to take into account the "nature and scope of the destination club activities on the whole, as compared to that of resident

homeowners."  Plaintiffs cite the testimony of Umang Gupta who expressed his opinion that the scale and scope of PBL1's use is qualitatively different from resident owners, citing the revenues it receives, the number of guests staying in the units at one time, the frequency of occupancy, and services received.  The Circuit Court considered and weighed the evidence presented by the Plaintiffs.  In essence, Plaintiffs argue that the Circuit Court did not give this evidence sufficient weight in finding that the actual use of the Lot B units did not rise to the level of a commercial use.  We will not pass upon the trial judge's decisions with respect to the credibility of witnesses and the weight of the evidence because this is the province of the trial judge.

For these reasons, and based on the entirety of the record on appeal, we conclude that the Circuit Court did not clearly err when it found that PBL1's actual use of the Lot B units at the Pauoa Beach subdivision for destination club purposes does not rise to the level of a commercial use because the court failed to examine the overall "scale and scope" of PBL1's rental activity of the Lot B units.  In light of our conclusion that the Circuit Court erred in concluding that PBL1's use of the property was a commercial use based on the court's interpretation of the Project Documents notwithstanding that the actual use was not commercial, we further conclude that the Circuit Court's findings that the actual use of the Lot B units did not rise to the level of commercial use are dispositive of this dispute.

Plaintiffs also contend that the Circuit Court erred when the court denied their requests for injunctive relief and for attorneys' fees.  However, in light of our resolution of the other issues raised on this appeal, we conclude that these arguments are without merit.

V.    CONCLUSION

Based on the above, the Circuit Court's June 9, 2017 Remand Judgment is reversed insofar as it concluded that PBL1's use of the Lot B units was a commercial use, in violation of the restrictive covenants contained in the Project Documents.  The Remand Judgment is otherwise affirmed.  The Order Denying Attorneys' Fees is affirmed.

DATED: Honolulu, Hawai'i, January 27, 2023.

On the briefs:

Robert G. Klein,
R. John Seibert,
Lisa W. Cataldo,
Jordon J. Kimura,
(McCorriston Miller Mukai
 MacKinnon LLP),
(and with William C. McCorriston
 on the Reply Brief),
for Defendant-Appellee/
 Cross-Appellant
EXCLUSIVE RESORTS PBL1, LLC.

Margery S. Bronster,
Rex Y. Fujichaku,
Sasha A. Hamada,
(Bronster Fujichaku Robbins),
for Plaintiffs-Appellants
DAVID COWAN AND NATHALIE
COWAN, UMANG P. GUPTA AND
RUTH M. GUPTA, AS TRUSTEES OF
THE UMANG AND RUTH GUPTA
TRUST UNDER TRUST AGREEMENT
DATED JANUARY 18, 2000, AND
PAUOA BEACH 8 LLC.

/s/ Katherine G. Leonard
Presiding Judge

/s/ Clyde J. Wadsworth
Associate Judge

/s/ Sonja M.P. McCullen
Associate Judge